**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

SHANNON A. MILLER PLAINTIFF

v. 5:08CV00176 JLH/JTR

MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration DEFENDANT

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

## INSTRUCTIONS

This recommended disposition has been submitted to United States District Judge J. Leon Holmes. The parties may file specific objections to these findings and recommendations, and, if they do, they must provide the factual or legal basis for each objection. The objections must be filed with the Clerk no later than eleven (11) days from the date of the findings and recommendations. A copy must be served on the opposing party. The United States District Judge may reject these proposed findings and recommendations, in whole or in part, even in the absence of objections.

## RECOMMENDED DISPOSITION

### I. Introduction

Plaintiff, Shannon A. Miller, has appealed the final decision of the Commissioner of the Social Security Administration denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Both parties have filed Appeal Briefs (docket entries #12 and #16), and the issues are joined and ready for disposition.

The Court's function is to determine whether the Commissioner's decision is supported by substantial evidence, on the record as a whole, and whether it is based on legal error. *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997); *see also*, 42 U.S.C. § 405(g). While "substantial

evidence" is that which a reasonable mind might accept as adequate to support a conclusion,[1] "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

In her March 9, 2004 "Disability Report," Plaintiff alleged that "bipolar, manic depression" were the "illnesses, injuries, or conditions that limited [her] ability to work." (Tr. 138.) On September 24, 2007, the Administrative Law Judge ("ALJ") conducted an administrative hearing during which Plaintiff and a vocational expert testified. (Tr. 389-417.) On September 27, 2007, the ALJ entered his decision (Tr. 17-26) holding that Plaintiff had not been under a disability,[2] within the meaning of the Social Security Act, at any time through September 27, 2007, the date of his decision. (Tr. 26.)

On April 25, 2008, the Appeals Council denied Plaintiff's request for a review of the ALJ's decision; thereby making it the final decision of the Commissioner. (Tr. 6-8.) Plaintiff then filed her Complaint initiating this appeal. (Docket entry #2.)

Plaintiff was 38 years old at the time of the administrative hearing. (Tr. 393.) She testified that she completed the sixth grade in school and half of the seventh grade.[3] *Id.* During the last ten

---

[1]*Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

[2]"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382(a)(3)(A). A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3) & 1382(a)(C)(I).

[3]She was in special education classes for reading and math. (Tr. 156.) She was held back in the first, third, and fourth grades. She received mostly D's and F's and dropped out of school midway

years, Plaintiff's past relevant work included jobs as a dishwasher, nurse's aid, file clerk, and an unspecified job in a meat packing house. (Tr. 394-399.) Plaintiff did not hold any of these jobs for more than one year and most of these jobs were held for only a few weeks or months. *Id.* The three years she earned the most were 1995 ($5,333); 1998 ($6,990); and 1999 ($7,300). In all other years, Plaintiff earned less than $3,110. (Tr. 108-115.) She testified that she was usually fired from these jobs, within a few weeks or months, because of her "temper" and her inability to get along with her coworkers. (Tr. 394-399.)

The ALJ considered Plaintiff's impairments by way of the required five-step sequential evaluation process. Step 1 involves a determination of whether the claimant is involved in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(i) (2005), §416.920. If the claimant is, benefits are denied, regardless of medical condition, age, education or work experience. *Id.*, § 404.1520(b), § 416.920.

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has an impairment or combination of impairments which significantly limits claimant's ability to perform basic work activities, a "severe" impairment. *Id.*, § 404.1520(4)(ii), § 416.920. If not, benefits are denied. *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment which is presumed to be disabling. *Id.*, § 404.1520(a)(iii), § 416.920.[4] If so, and the duration requirement is met, benefits are awarded. *Id.*

Step 4 involves a determination of whether the claimant has sufficient residual functional capacity, despite the impairment(s), to perform the physical and mental demands of past relevant work. *Id.*, § 404.1520(4)(iv), § 416.920. If so, benefits are denied. *Id.*

---

through the seventh grade. (Tr. 336.)

[4]If the claimant's impairments do not meet or equal a Listing, then the ALJ must determine the claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence. *Id.*, § 404.1520(e). This RFC is then used by the ALJ in his analysis at Steps 4 or 5. *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to other work, given claimant's age, education and work experience. *Id.*, § 404.1520(4)(v), § 416.920. If so, benefits are denied; if not, benefits are awarded. *Id.*

The ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since her alleged onset date of January, 2002[5] (Tr. 18); (2) had a "severe" combination of impairments (*id.*); (3) did not have an impairment or combination of impairments that met or equaled a Listing (*id.*); (4) was not totally credible in her subjective complaints (Tr. 22); (5) retained the RFC for all work-related activities except she was limited to jobs with a reasoning development level of one or two, as defined in the DICTIONARY OF OCCUPATIONAL TITLES, and which required no more than superficial contact with the public and coworkers (Tr. 24); (6) was unable to perform her past relevant work[6] (*id.*); but (7) was able to perform other work, which jobs existed in significant numbers in the national economy, for example, cleaner, laundry worker, and sorter and inspector.[7] (Tr. 25.) Thus, the ALJ concluded that Plaintiff was not disabled. (Tr. 26.)

In her Appeal Brief, Plaintiff makes one argument for reversal: The ALJ erred, as a matter of law, in finding that her impairments did not meet, medically equal, or functionally equal Listing 12.05C or D. (*Pltff.'s App. Br.* at 14-17.) Because this argument has merit, the Court recommends that the Commissioner's decision be reversed and that the case be remanded to the Commissioner for further proceedings consistent with this opinion.

---

[5]He noted that Plaintiff had earnings after her alleged onset date, but those earnings did not rise to the level of substantial gainful activity. (Tr. 18.)

[6]The ALJ failed to identify or describe Plaintiff's past relevant work but, nonetheless, concluded that she could no longer perform it.

[7]At step 5 of his analysis, the ALJ correctly noted that, once Plaintiff was determined to be unable to perform her past relevant work, the burden shifted to the Commissioner to show a significant number of jobs within the economy that she could perform, given her RFC, age, education, and past work. (Tr. 24.)

## II. Discussion

### A. Plaintiff's Medical History Relevant to Determining Her Mental RFC

The earliest reference to Plaintiff's mental health problems is contained in a 2003 Presentence Report prepared by the Probation Officer for the Eastern District of Arkansas. *USA v. Shannon Miller*, 4:02CR00115 WRW.[8] (Tr. 183-184.) According to the Presentence Report, Plaintiff suffered from manic depression. Between 1999 and 2002, she received mental health counseling at Southeast Arkansas Mental Health Center in Pine Bluff, Arkansas ("SAMHC"). At the time the Presentence Report was prepared, Plaintiff was taking Clonazepam, Paxil, Zyprexia, and Risperdol.

On February 28, 2003, Plaintiff underwent a mental health evaluation at Little Rock Community Mental Health Center, Inc. ("LRCMHC"). She was diagnosed with "Major Depressive D/O, Generalized Anxiety, Bipolar I Mixed." Among other things, Plaintiff disclosed that she had a history of suicide ideation and that she had twice tried to commit suicide: once by cutting her wrist and once by taking an overdose. *Id.*

At some point in 2003, it appears Plaintiff entered a guilty plea and was sentenced to an undisclosed term of imprisonment in the BOP.

On March 23, 2004, Plaintiff was seen at SAMHC to "get back on med[ications]" for her mental health problems.[9] (TR. 191.) Lisa Hoover, a licensed clinical social worker ("LCSW"), and Dr. Greg Wooten, a psychiatrist, completed an Adult Diagnostic Assessment of Plaintiff. They made a provisional Axis I diagnosis of "polysubstance dependency and bi-polar disorder - NOS." They assigned Plaintiff a GAF score of 50. (Tr. 200.) They noted Plaintiff: (1) had no friends (Tr. 192); (2) had poor concentration and a short attention span (Tr. 193); and (3) had problems in functional

---

[8]It appears Plaintiff was indicted in the Eastern District of Arkansas for using someone else's name to obtain a United States passport in violation of 18 U.S.C. § 1542. The case was assigned to United States District Judge William R. Wilson, Jr.

[9]While it is unclear from the record, Plaintiff's visit to SAMHC may have coincided with her release from the BOP.

domains which included "anger/aggressive (quick temper), inattention, impulsivity, impaired reality testing and mood swings." (Tr. 197.) Their mental health summary reflected that Plaintiff had impairments in attention, concentration, and insight. (Tr. 198.) They estimated her intelligence as "*borderline*." *Id.*

On April 12, 2004, Dr. Wooten performed a psychiatric evaluation of Plaintiff. (Tr. 188-190.) Plaintiff told Dr. Wooten that she had been followed for bipolar disorder "at least since 2001," and had been prescribed such medications as Seroquel, Xanax, Klonopin, Depakote, Zyprexa, Risperidone, and Paxil. (Tr. 188.) While she gave "a history . . . of having some depressive symptoms, with crying all the time," Dr. Wooten noted that she did "not appear to be depressed and does not have a depressed affect when she describes feeling sad." *Id.* She told Dr. Wooten that she had been married for ten years to an abusive husband; had a poor relationship with her current boyfriend; and did not currently use drugs or alcohol. (Tr. 189.)

At Axis I, Dr. Wooten diagnosed "bipolar disorder - NOS, currently mixed v. hypomanic." At Axis II, he diagnosed "rule out personality disorder." He again assigned Plaintiff a GAF score of 50. (Tr. 189-190.)

About one month later, on May 18, 2004, a DDS reviewing psychologist completed a Mental RFC Assessment Form (Tr. 207-210) and a Psychiatric Review Technique Form.[10] (Tr. 211-225.) At the time the psychologist reviewed Plaintiff's medical records, they did *not* contain any IQ test results. While noting that Plaintiff suffered from two affective disorders (full or partial manic or depressive syndrome and bipolar disorder (Tr. 211, 214)), the reviewing psychologist checked boxes on the Mental RFC Assessment Form indicating that Plaintiff was only "Moderately Limited" or "Not Significantly Limited" in *all aspects* of: (1) Understanding and Memory; (2) Sustained Concentration and Persistence; (3) Social Interaction; and (4) Adaptation. Suffice it to say, these "checked boxes" do *not* coincide with Dr. Wooten's March 23, 2004 and April 12, 2004 opinions that Plaintiff: (1) had borderline intellectual functioning; (2) impairments in attention, concentration,

---

[10]The reviewing psychologist based his opinion entirely on a review of Plaintiff's medical records.

and insight; (3) poor social interaction skills (no friends, anger/aggressive behavior); and (4) adaptation problems related to her bipolar disorder. As a treating physician, Dr. Wooten's opinions were entitled to more weight than those of the reviewing psychologist. *See Dixon v. Barnhart*, 324 F.3d 997, 1002-03 (8th Cir. 2003) (in light of opinions of treating and examining physicians that were entitled to substantial weight, the ALJ erred in relying on the contradictory opinion of a non-examining reviewing physician based only on a review of medical records).

On June 6, 2004, two months after the reviewing psychologist completed his Mental RFC Assessment Form, Plaintiff attempted to commit suicide for the third time. When Plaintiff arrived at the Jefferson County Regional Medical Center ("JCRMC"), Dr. Wooten was the psychiatrist on call. According to the notes of Joyce Walker, a LCSW, Plaintiff "made four fairly significant cuts to her arm . . . [which required] a number of stitches in [her] arm." Upon admission to JCRMC, Plaintiff was diagnosed as follows: Axis I "Major Depressant Disorder"; Axis II "Borderline Personality Disorder." At Axis V, her GAF score was 25. (Tr. 203.)

On August 6, 2004, another DDS psychologist reviewed Plaintiff's medical records and noted essentially the same findings made by the first reviewing psychologist on May 1, 2004.[11] (Tr. 243-63.) The only differences in the findings of these two reviewing psychologists were that the second DDS psychologist opined that Plaintiff would experience "moderate limitations" in her ability to interact appropriately with the general public, and that she would *not* be "significantly limited" in her ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 244.) The second reviewing psychologist also checked essentially the same boxes on Plaintiff's Mental RFC Assessment Form. (Tr. 245.)

On June 9, 2005, Plaintiff received a Psychiatric Evaluation from Dr. Brandon Wall, a psychiatrist with the LRCMHC. Dr. Wall noted that Plaintiff recently relocated to Little Rock from Pine Bluff where she had been under the treatment of Dr. Wooten. Plaintiff reported to Dr. Wall that

---

[11]This reviewing psychologist also based his opinion solely on a review of Plaintiff's medical records.

she "sees shadows and things other people don't see." She reported hearing voices telling her to kill herself; ants talked to her; and she sometimes felt like "she [has] turtles in her shoes." She also reported having racing thoughts and mood swings on a daily basis and having problems with irritability and impulsivity. Finally, she described panic attacks in which she had difficulty breathing and swallowing. Dr. Wall diagnosed: Axis I Generalized anxiety disorder, major depressive disorder, recurrent, currently mild; Axis II Borderline personality disorder; and Axis V: GAF score of 45. Dr. Wall placed Plaintiff on Depakote, Geodon, and Remeron. (Tr. 362-363.)

In early November of 2005, it appears Judge Wilson revoked Plaintiff's supervised release, and she was incarcerated in the BOP's Carswell Federal Medical Center in Fort Worth, Texas.[12] (Tr. 405, 349, 335.) On July 19, 2006, shortly before her release from the BOP, Plaintiff received a Psychological Evaluation performed by Anne Graham, a "Psychology Practicum Student," under the direction of Dr. Del Rio, a staff psychiatrist. (Tr. 335-341.) As part of this Psychological Evaluation, Plaintiff was administered the Wechsler Adult Intelligence Scale-3d edition. *This is the only IQ test that appears in the medical record*.

According to the examiner, Plaintiff "appeared to give her best effort throughout administration [of the IQ test]." (Tr. 337.) She scored a verbal IQ of 66 (1st percentile), performance IQ of 74 (4th percentile), and full-scale IQ of 67 (1st percentile).[13] (Tr. 338.) According to the examiner, these results appeared to be "reliable and valid estimates of [Plaintiff's] current level of intellectual functioning." The examiner assigned a 95% probability that Plaintiff's Full Scale IQ was between 64 and 72. *Id.* Finally, the examiner found that Plaintiff's verbal IQ of 66 "is likely a more accurate measure of her true ability."[14] (Tr. 339.)

---

[12] Judge Wilson ordered Plaintiff to serve one year and one day in the BOP for violating the terms of her supervised release. (Tr. 336.) She completed her sentence and was released on August 11, 2006. (Tr. 351.)

[13] IQ scores between 55 and 70 represent mild mental retardation. IQ scores between 71 and 84 represented "borderline" intellectual functioning. *See* DSM-IV TR at 42, 740.

[14] The examiner found that Plaintiff's full Scale and Performance IQ scores were "not interpretable" due to "non-unitary constructs." (Tr. 339.) However, Plaintiff's Verbal IQ (her lowest

Importantly, these IQ scores are *consistent* with Plaintiff's educational history. The examiner noted that Plaintiff "achieved mostly D's and F's and dropped out of school in the 7th grade . . . ." She reported that Plaintiff attended Special Education classes every year, and she was held back in 1st, 3rd, and 4th grades. (Tr. 336.) On the same day Plaintiff was administered this IQ test, she learned that "she failed *all sections* of her GED pre-test." (Emphasis added.) (Tr. 337.)

According to the Psychological Evaluation, Plaintiff was diagnosed as follows: "Axis I Bipolar Disorder, Most Recent Episode Hypomanic, without Full Interepisode Recovery;" and "Axis II Personality Disorder Not Otherwise Specified, with Antisocial and Borderline Features." (Tr. 340.) Under the heading "Mental Health History," the examiners noted Plaintiff's long history of serious mental health issues, which included at least two attempts at suicide. (Tr. 336-337.)

In light of Plaintiff's family history, the severity of these mental health issues is not surprising. Plaintiff reported that: (1) her stepfather was an alcoholic, and her mother was a chronic drug user; (2) "she was physically, sexually, and emotionally abused by her stepfather from the ages of 5 to 13"; and (3) at the age of 13, she ran away from home and became a prostitute. (Tr. 336.) Plaintiff also reported being physically abused by her ex-husband. (Tr. 335.)

On August 24, 2006, shortly after her release from the BOP, Plaintiff received a Psychiatric Evaluation performed by Dr. Seetal Kakumani, a psychiatrist with the LRCMHC. (Tr. 349-354.) Among other things, Dr. Kakumani noted that Plaintiff suffered from erratic sleep, occasional feelings of worthlessness, poor concentration, possible visual hallucinations, and paranoia. (Tr. 349-350.) Dr. Kakumani diagnosed: "Axis I: bipolar disorder - NOS, rule out bipolar disorder, type I, most recent episode hypomanic to manic with some psychotic features, generalized anxiety disorder, panic episodes without agoraphobia, history of alcohol and cocaine dependence in partial remission, history of dyslexia; Axis II: borderline personality traits; and Axis V: GAF score of 40." (Tr. 352-353.) He placed Plaintiff on Lamictal, Remeron, and Clonazepam. (Tr. 353.)

---

score) was "unitary" and valid.

Finally, according to a medical summary dated October 21, 2006, Plaintiff's current medications were Risperdol, Paxil, and Alprazolam. (Tr. 332.)

**B. The ALJ Erred in Determining that Plaintiff's Impairments Did Not Meet Listings § 12.05C or D**[15]

In order to meet Listing § 12.05C, Plaintiff was required to demonstrate that she has "a valid verbal, performance, or full scale IQ of 60 through 70 *and* a . . . mental impairment imposing additional and significant work-related limitations of function." As indicated previously, the *only* IQ test in the medical record was the one administered to Plaintiff on July 18, 2006, while she was incarcerated in the BOP. The examiner made it clear that Plaintiff gave good effort while taking the test and that the results showed a *valid IQ score* as follows: *verbal IQ 66; performance IQ 74; full scale IQ 67* (Tr. 338-339.)[16] Plaintiff's performance in school was consistent with these IQ scores:

---

[15]In pertinent part, these Listings provide the following:

> 12.05 *Mental retardation:* Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> OR
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1 (2007.).

[16]The examiners went on to note that the "presence of non-unitary constructs [made Plaintiff's] Full Scale IQ and Performance IQ scores . . . not interpretable." (Tr. 339.) The examiners did not explain and the Court does not understand what they meant in finding that Plaintiff's Full Scale and Performance IQ scores were "not interpretable"due to "the presence of non-unitary constructs." However, those phrases *cannot* mean that these two scores were not valid. The examiners make it clear, earlier in their report, that:

> "The following results appear to be reliable and valid estimates of Ms. Miller's current level of intellectual functioning because of her overall effort and cooperation. Ms. Miller, with a chronological age of 37 years and 4 months, achieved a Verbal IQ

(1) she dropped out half way through the seventh grade; (2) she was in special education classes; (3) she made mostly D's and F's; and (4) she was held back in the first, third, and fourth grades. Additionally, in their initial evaluation of Plaintiff, on March 23, 2004, Dr. Wooten and LCSW Hoover estimated her intelligence as "*borderline*." (Tr. 198.) Finally, in her testimony during the administrative hearing, Plaintiff made it clear that: "I don't read period" (Tr. 408); "I don't know how to get a bank statement started"; and "I don't know how to, to handle money. I don't know anything about it." (Tr. 401.) Thus, other evidence in the record also *supports* Plaintiff having "a valid verbal, performance, *or* full scale IQ of 60 through 70." [Emphasis added.]

In his decision, the ALJ gave the following reasons for rejecting *both* Plaintiff's "valid IQ scores of 60 through 70" *and* the other evidence in the record supporting the validity of those scores:[17]

(1) "[S]he was in special education classes while in school [but] she has passed a driver's license test."

(2) "[S]he was capable of arranging for a false passport for herself when she had outstanding warrants."

(3) "[N]o examining physician has commented that Ms. Miller appears to be mentally retarded or have borderline intelligence."

(4) "[M]s. Miller's speech and intellectual functioning exhibited at the [administrative hearing], as well as her work history, argues against deficits in adaptive functioning

---

> of 66 (1st percentile), a Performance IQ of 74 (4th percentile), and a Full Scale IQ of 67 (1st percentile). . . . Her overall performance is classified in the Extremely Low Range."

(Tr. 338.)

[17] While the Listing requires the onset of disability before age 22, *i.e.*, "during the developmental period," IQ scores recorded *after* the developmental period may satisfy a claimant's burden to establish the time of onset. *See Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006) ("a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning"), *quoting Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001). This is especially true in this case, where there is strong evidence of Plaintiff's very low level of achievement in grades 1 through 6.

and indicate the claimant has greater mental capability than her intelligence quotient scores indicate."

(Tr. 19.)

The Court finds each of these purported grounds for rejecting Plaintiff's valid IQ scores to be spurious. The ALJ clearly erred, as a matter of law, in finding that Plaintiff's ability to pass an Arkansas driver's license test and obtain a false passport was *evidence* that her IQ must be above 70.[18] Similarly, the ALJ's third ground for rejecting Plaintiff's valid IQ scores is erroneous, as a matter of fact. Dr. Del Rio, a BOP staff psychiatrist was one of Plaintiff's *treating physicians* while she was incarcerated, reviewed and signed the July 19, 2006 Psychological Evaluation which determined that Plaintiff had a *valid* verbal IQ of 66, performance IQ of 74, and full scale IQ of 67.[19] (Tr. 338, 341.)

The ALJ's fourth ground for rejecting Plaintiff's valid IQ scores of 70 or less is perhaps the most troubling. How can an ALJ hazard a guess as to claimant's valid IQ, based on his or her answers to short, simple questions during a brief administrative hearing, and then conclude that this "guess" is more accurate than the claimant's valid IQ scores on the Wechsler IQ test? Without bothering to answer this question, the ALJ found that Plaintiff's "speech and intellectual functioning exhibited at the hearing . . . indicates the claimant has greater mental capacity than her intelligence quotient scores indicate." (Tr. 19.)

A fair reading of Plaintiff's testimony reveals the following: (1) she was easily confused by a number of simple and straight forward questions asked by the ALJ and her attorney; (2) many of

---

[18]The ALJ, who resided in Texas, did not explain how he knew the level of ability necessary to pass the Arkansas driver's license test or how that translated into a presumptively valid IQ score higher than 70. Because the record contains *no facts* explaining how Plaintiff obtained the false passport, the ALJ was in no position to express an opinion on how this fact proved that Plaintiff's IQ must be higher than 70.

[19]Dr. Wooten, another of Plaintiff's *treating physicians*, concluded in one of his early examinations that she had "borderline" intellectual functioning. (Tr. 198.) While Dr. Wooten did not perform an IQ test, it was his opinion that Plaintiff's IQ might be in the low 70's, an estimate that was fairly close to her actual full scale IQ of 67 and verbal IQ of 66.

her answers were vague, unfocused, and confusing; (3) she made it clear that she does not read and cannot keep a bank account; and (4) she cannot count or keep track of money. (Tr. 401.) In short, *nothing* in Plaintiff's testimony suggested that her level of intelligence was anything other than what the record supported: A 38-year-old woman, with an IQ between 66 and 70, who had completed the sixth grade in special education classes, where she made mostly D's and F's.

Finally, contrary to the ALJ's assertion, *nothing* in Plaintiff's "work history" supports the propostion that she "has greater mental capability than her intelligence quotient scores indicate." Almost all of Plaintiff's jobs involved *menial work* as a dishwasher, maid, filing clerk, and nurse's assistant. Furthermore, with only two exceptions, she held all of these jobs for only a few weeks or months before being fired or quitting because she could not get along with her coworkers. (Tr. 396-401.)

Thus, the Court concludes that substantial evidence does not support the ALJ's determination that Plaintiff's "verbal, performance, or full scale IQ" was above 70.

The medical record also contained strong evidence documenting Plaintiff's long history of bipolar disorder, generalized anxiety disorder, borderline personality trait disorder, and chronic depression. Most of Plaintiff's GAF scores have been 50 or below, with multiple GAF scores of 40 and 45. As noted by the ALJ, Plaintiff attempted suicide on three separate occasions.

These "other mental impairments," all of which are well documented in the medical record, would certainly appear to impose "an additional and significant work-related limitation of function" under Listing § 12.05C. To support his opinion to the contrary, the ALJ relied solely on the findings of the two reviewing psychologists, even though those findings were in conflict with the opinions of at least three of Plaintiff's treating psychiatrists. The ALJ also alluded to Plaintiff's *prior* drug and alcohol abuse,[20] and her "legal history, which involves falsehood."[21] (Tr. 23-24.) While he

[20]The ALJ noted that, at the time of the administrative hearing, Plaintiff had not used drugs in one year and one week. (Tr. 23.)

[21]The tone of the ALJ's opinion suggests that he found Plaintiff to be a "bad person" and disapproved of the way she had lived her life. Such opinions are irrelevant to whether Plaintiff is

noted Plaintiff's numerous GAF scores in the 40 to 50 range (which he acknowledged would be evidence of "major limitation in several areas such as work, family relations, judgment, thinking or mood (Tr. 21)), he *speculated* that these low scores were based on Plaintiff's "subjective complaints and not on objective findings." (Tr. 24.) He then cherry picked her GAF score of 60, which was assessed in October of 2006 (*while she was incarcerated*)[22] and her GAF score of 55, assessed in June of 2004, as evidence "not consistent with an allegation of disability." (Tr. 24.)

Thus, the Court also concludes that substantial evidence does not support the ALJ's evaluation of Plaintiff's other mental impairments under Listing 12.05C or D.

**III. Conclusion**

On remand, the ALJ must update the medical record and ensure that a consulting psychiatrist or psychologist performs an IQ test to determine the level of Plaintiff's intellectual functioning. The ALJ should also reevaluate how Plaintiff's long and well-documented history of bipolar disorder, borderline personality trait disorder, and chronic depression impose work-related limitations of function under Listing 12.05C and how those limitations affect Plaintiff in each of four domains of functioning set forth in Listing 12.05D.

IT IS THEREFORE RECOMMENDED THAT the Commissioner's decision be reversed and this matter be remanded to the Commissioner for further proceedings consistent with this opinion. This should be a "sentence four" remand within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

DATED this 26th day of June, 2009.

J. Thomas Ray
UNITED STATES MAGISTRATE JUDGE

---

"disabled" within the meaning of the Social SecurityAct.

[22]Achieving a GAF score of 60, while incarcerated in the carefully controlled hospital environment at Carswell Federal Medical Center in Forth Worth, is of little evidentiary value in predicting how Plaintiff would perform in a real-world work environment. This is borne out by the fact that most of Plaintiff's real-world GAF scores are 50 or below.